UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ANTONIO JONES, JR.,

     Plaintiff,

v.

                                    Case No.: 2:21-cv-764-JLB-NPM

MARTIN DAVILA,

     Defendant.

_____/

## ORDER

This case is before the Court on Defendant's Motion for Summary Judgment. (Doc. 43). Plaintiff submitted a response in opposition (Doc. 47) and Defendant filed a reply (Doc. 48). The Court has carefully reviewed the parties' briefing and viewed the evidence in the light most favorable to Plaintiff Antonio Jones, Jr. For the reasons set forth below, Defendant's Motion is **GRANTED** as to all counts of the operative complaint.

## BACKGROUND

On May 21, 2020, Defendant Officer Davila of the Fort Myers Police Department responded to a call of a trespasser at 2335 Cleveland Avenue, which was a RaceTrac gas station. (Doc. 43-1 at 2). According to the Probable Cause Statement, the notes of the call stated that a white male was at the gas station trespassing and had tried to steal something inside the store. (*Id.*) Moreover, the Probable Cause Statement notes that the RaceTrac gas station was "designated a

1

'problem' location by [the] [Fort] Myers Police Department because [of] extremely high calls for service." (*Id.*)  The Fort Myers Police Department and RaceTrac management "realize that many people, particularly transients, 'charge' cell phones at the gas station as cover for illegal activity, such as buying [and] selling narcotics, theft from Race[]Trac, [and] prostitution." (*Id.*)  "In response to this criminal activity officers have increased patrol at Race[]Trac to prevent, and arrest those committing crimes." (*Id.*)

Defendant submitted several items indicating that various individuals involved with RaceTrac authorized the Fort Myers Police Department to "warn and direct persons to leave" that RaceTrac location via what Defendant refers to as a "Trespass Authorization." (Doc. 43-3 at 1–4).  The first is a log that has dates ranging from 2013 through 2016, and one date in 2021, which seem to reflect the receipt of renewal letters. (*Id.* at 1).  The second item is a document titled "Trespass Warning Authorization Form for Businesses" and signed by the owner or manager of the RaceTrac gas station on January 26, 2021. (*Id.* at 2).  This authorization allows the officers of the Fort Myers Police Department to warn and direct persons to leave the RaceTrac. (*Id.*)  The third is a letter dated February 14, 2013, with the subject, "No Trespass Warning Signs," which is signed by the RaceTrac Construction Manager. (*Id.* at 3).  Like the Trespass Warning Authorization Form for Businesses, this authorization permits the officers of the Fort Myers Police Department to warn and direct persons to leave the RaceTrac. (*Id.*)  Finally, Defendant provided a letter from the Fort Myers Police Department dated March

14, 2016, indicating that the Trespass Warning letter for the RaceTrac would expire on March 31, 2016.  (*Id.* at 4).  Taken together, these documents indicate that there have been Trespass Authorizations on file with the Fort Myers Police Department since at least 2013, but that the last renewal before the update in 2021 was in May 2016.  (*Id.* at 1–4).  A document referred to by Defendant as a Dispatch Report indicates: "Letter of authorization for trespass enforcement on file.  Dated 03/27/2015.  Authorized by JOSEPH GRAHAM."  (Doc. 43-4 at 2).  It is unclear whether there was an unexpired Trespass Authorization on file for the RaceTrac in May 2020.

In all events, when Officer Davila—who was wearing a body camera— arrived on scene in May 2020, he exited his patrol vehicle.  (Video at 0:25).[1]  Officer Davila testified that he spoke with an employee who said that the white male suspect the call was placed about had left.  (Doc. 43-2 at 21).  The sound from the body camera footage turns on at 29 seconds, at which point Officer Davila can be heard saying "Where'd he go?"  (Video at 00:29–00:32).  The Court can hear that someone was speaking, presumably responding to Officer Davila's question, but the response is inaudible.

---

[1] Both parties provided a video of the incident from Officer Davila's body camera. Copies of these videos are held by the Clerk's office.  (*See* Doc. 43; Doc. 47).  One version of the video was one minute and forty seconds long; the other was nine minutes long.  As far as the Court can tell, the shorter version of the video is contained within the longer version. The Court will cite to the longer version of the video as "Video" and will rely on that version of the video.  Moreover, the Court will cite the time of the actual video rather than the timestamp on the upper right-hand corner to identify which portion of the video it is referring to.

Immediately after, it appears that Officer Davila noticed Mr. Jones, a black male, standing across the parking lot because he motioned to Plaintiff with his arm and said, "What are you doing?"  (*Id.* at 00:36-00:38).  Officer Davila then waved his arm and said, "Get the f*ck out, get out of here, get out, get off the property."  (*Id.* at 00:37–00:44).  As Officer Davila approached, Mr. Jones said, "I'm standing here waiting on my f*cking ride, I'm not loitering, I'm not loitering. . . I . . . told the lady in the store, I'm waiting on somebody to come pick me up."  (*Id.* at 00:58–01:09).  Mr. Jones testified that he had permission from a person who he believed was the manager of the RaceTrac to charge his phone.  (Doc. 43-5 at 59).  Mr. Jones stated that he was a regular customer at the RaceTrac and that he went inside to seek permission to charge his phone when he arrived at the RaceTrac that day because there were a lot of homeless people at the RaceTrac and he "always [saw] [the manager] coming out saying, hey, y'all have to leave."  (*Id.* at 59–60).

Officer Davila testified that he did not ask anyone whether Mr. Jones had permission to be there.  (Doc. 43-2 at 27) ("On the day that you . . . saw Mr. Jones, . . . isn't it accurate . . . that you did not speak to the owner or an employee regarding whether they had given specific consent to Mr. Jones that he could be charging the phone there?  A. Correct.").  Officer Davila also testified that he had previously spoken with a manager of the RaceTrac on a different occasion who "stated she didn't want anyone on property charging phones."  (*Id.*)

As Officer Davila approached Mr. Jones, the video clearly shows that Mr. Jones was charging his phone, using an outlet attached to a utility pole.  (Video at

01:10–01:12).  Officer Davila then asked, "what's your name?" (*Id.* at 01:12–01:14).

Mr. Jones did not respond with his name, but as best as the Court can hear the

video, he instead asked "why." (*Id.* at 01:14–01:16).  Mr. Jones later testified that

he provided his name the first time he was asked, but the video is clear that he did

not. (*See* Doc. 43-5 at 84–86).  Officer Davila responded explaining that he asked

for his name "because [Mr. Jones was] stealing electricity." (Video at 01:16–01:17).

Mr. Jones started to respond or explain himself, but Officer Davila interrupted and

said "alright, that's it, we're done, what's your name?" (*Id.* at 01:18–01:21).  Mr.

Jones said, "for what?" (*Id.* at 01:21–01:23).

        Immediately after, the video shows Officer Davila reaching for one of Mr.

Jones's arms and, with the assistance of a female officer, Officer Davila placed

handcuffs on Mr. Jones. (*Id.* at 01:23–01:41).  During this time, Officer Davila

asked Mr. Jones to turn his wrist and, moments later, said "there we go" as it

sounded like the handcuffs clicked into place. (*Id.* at 01:36–01:38).  Officer Davila

asked Mr. Jones four times to have a seat, and Mr. Jones then sat down on the curb.

(*Id.* at 01:42–01:55).  At this juncture, someone in a vehicle who could be seen in the

background speaking to what appears to be another officer said, there "was another

white man," to which Officer Davila responded, "no, I understand." (*Id.* at 01:54–

02:00).  All the while, Mr. Jones repeated that he was "not loitering," was "waiting

on somebody to come pick [him] up," "didn't do sh*t wrong," and was "not telling

[Officer Davila] sh*t." (*Id.* at 01:41–01:56).  He could also be heard saying, "what

5

the f*ck are you f*cking with me for" and "get the f*ck off me . . . b*tch." (*Id.* at 01:46–01:49).

Officer Davila then walked Mr. Jones over to his police vehicle, while Mr. Jones explained that he had "already been in a family situation" and was "already upset." (*Id.* at 01:58–02:05). On the walk over, Mr. Jones repeated that he did not "do sh*t" and asked, "what are you detaining me for?" (*Id.* at 02:07–02:14). When they got to the police car, Mr. Jones again repeated that he didn't do anything and, when Officer Davila appeared to touch Mr. Jones's pockets, Mr. Jones indicated that he did not have any drugs or weapons. (*Id.* at 02:28–02:32). Mr. Jones then said, "I'm sorry for disrespecting you, but I'm already mad." (*Id.* at 03:02–03:05). He explained that he "just got kicked . . . out by [his] older . . . sister." (*Id.* at 03:05–03:11). He further stated that he felt like Officer Davila was harassing him. (*Id.* at 03:12–03:20). At that point, Officer Davila took off the handcuffs, took Mr. Jones's backpack off, and put the handcuffs back on, as Mr. Jones again asked what he was being detained for and stated, "you could ask for my ID, you could run my stuff." (*Id.* at 03:30–03:59).

Then, Officer Davila asked Mr. Jones for his name again. (*Id.* at 03:59–04:00). Mr. Jones responded, "Antonio Jones, Jr" and provided his date of birth. (*Id.* at 04:00–04:04). As Officer Davila was placing Mr. Jones into the police vehicle, Mr. Jones repeatedly asked, "what are you detaining me for?" (*Id.* at 04:05–04:24). Officer Davila never responded to the question but instead simply told Mr. Jones to have a seat. (*Id.*) After Mr. Jones sat in the backseat of the patrol car and Officer

6

Davila shut the door, Officer Davila walked around to the front, sat down in the driver's seat, and turned the car on. (*Id*. at 04:30–5:05). He then asked, "do you have a license, Mr. Jones?" (*Id*. at 05:05). Mr. Jones's response, if any, was inaudible. (*Id*. at 05:06–05:22). The Probable Cause Statement indicates that Officer Davila ran Mr. Jones's name in the Driver and Vehicle Identification Database, but the search came back empty. (Doc. 43-1 at 2). Officer Davila then asked, "what's your social?" (Video at 05:22–05:29). Mr. Jones responded "I gotta give you my social security number?" (*Id*. at 05:29–05:32). Mr. Jones continued to speak, but the sound is not clear. (*Id*. at 05:32–05:39). Mr. Jones and Officer Davila then continued their exchange, with Mr. Jones, among other things, offering to get his wallet and repeating that he felt like he was being harassed. (*Id*. at 05:40–06:04). Officer Davila asked Mr. Jones for his middle name, which it does not appear from the recording that Mr. Jones provided. (*Id*. at 06:05–06:14).

In response to being asked to spell his name, Mr. Jones explained to Officer Davila that his license was in his wallet, which was in his bag. (*Id*. at 06:16–06:34). Officer Davila then exited the vehicle and began to look through the outside pockets of the backpack he took from Mr. Jones earlier. (*Id*. at 06:40–07:05). Officer Davila began looking through some of the exterior pockets but did not search the entire bag. (*Id*.) Mr. Jones said something to Officer Davila that was inaudible, after which Officer Davila put the backpack into the front seat and said, "we tried." (*Id*. at 07:06–07:17).

Officer Davila then walked around to the other side of the vehicle, opened the back door, and said "This is the last time I'm gonna ask you so please listen to me carefully.  Mr. Jones, you're on your way to jail, . . . my preference is not to take you to jail, so listen, listen closely."  (*Id.* at 07:21–07:51).  Before Officer Davila could ask his question, Mr. Jones yelled "Cuz, Trina, cuz, cuz, they harassing me cuz."  (*Id.* at 07:52–08:00).  Officer Davila then closed the door, said "we tried," and sat back down in the driver's seat of the vehicle, where Mr. Jones could still be heard yelling, presumably to his cousin.  (07:55–08:08).  In response to a question from another officer that cannot be heard in the video, Officer Davila said "he was over there, I went to ask him to identify himself, that was the end of it."  (*Id.* at 08:30–08:36).

The Arrest Report indicates that Mr. Jones was charged with two violations.  (*See* Doc. 43-1 at 1).  The first violation is under Florida Statute section 843.02, which is titled "[r]esisting officer without violence to his or her person."  Fla. Stat. § 843.02.  The second violation is under Florida Statute section 810.08(2a), which is titled "[t]respass in structure or conveyance."

## LEGAL STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018) (citation and internal quotation marks omitted).  An issue is "genuine" if a rational trier of fact, viewing all of the record evidence, could find in favor of the nonmoving party.  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

In ruling on a motion for summary judgment, the Eleventh Circuit has directed that courts "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014) (citation and internal quotation marks omitted).  Moreover, the Eleventh Circuit has provided:

> If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.  To defeat summary judgment, a mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.
>
> At the summary judgment stage, we view the evidence, draw all reasonable factual inferences, and resolve all reasonable doubts in favor of the non-movant.  But we do so only to the extent supportable by the record.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  Thus, in cases where a video in evidence obviously contradicts the nonmovant's version of the facts, we accept the video's depiction instead of the nonmovant's

> account and view the facts in the light depicted by the
> videotape.

*Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (citations and internal quotation marks omitted).  "[W]here the videos do not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to [the non-moving party]."  *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021).

## DISCUSSION

The Amended Complaint contains three overarching 42 U.S.C. § 1983 claims, which are labeled as a Fourth Amendment claim for unreasonable seizure (Count I), a Fourth Amendment claim for false arrest (Count III[2]), and a Fourth Amendment claim for false imprisonment (Count IV).  (Doc. 37 at 4–8).  The Court will consider Counts I and III together because "[u]nder the Fourth Amendment, an individual has a right to be free from unreasonable searches and seizures . . . [and] an arrest is a seizure of the person."  *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citation and internal quotation marks omitted).  False imprisonment under section 1983, however, is "based on the protection of the ***Fourteenth*** Amendment against deprivations of liberty without due process of law."  *Id.* at 1330 (emphasis added) (citation and internal quotation marks omitted).

But the threshold question underlying all of the claims is whether Officer Davila had probable cause to arrest Mr. Jones because each of these claims,

---

[2] The Amended Complaint does not contain a Count II.

regardless of whether they are brought under the Fourth or Fourteenth Amendment, depends on the presence or absence of probable cause. *See Crocker v. Beatty*, 995 F.3d 1232, 1243 (11th Cir. 2021) ("The existence of probable cause bars a Fourth Amendment false-arrest claim."), *cert. denied*, 142 S. Ct. 845 (2022); *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) ("The 'reasonableness' of an arrest is . . . determined by the presence or absence of probable cause for the arrest"); *Case*, 555 F.3d at 1330 ("[A] claim of false imprisonment, absent misidentification, depends on an absence of probable cause . . . .").

## I.     Probable cause, generally

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a [section] 1983 claim, but ***the existence of probable cause at the time of arrest is an absolute bar*** to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (emphasis added). "For probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Thus, "[a]n officer has probable cause when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Crocker*, 995 F.3d at 1243–44 (internal quotation marks and citation omitted). More recently, the Eleventh Circuit has stated that "the correct legal standard to evaluate whether an officer

11

had probable cause to seize a suspect is to 'ask whether a reasonable officer would conclude . . . that there was a substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 584 U.S. 48, 61 (2018)); *see id.* at 899 (finding that "[t]he older standard is more demanding than the *Wesby* standard" in that the older standard "requires facts and circumstances such that all prudent people would affirmatively believe that the suspect has already engaged in or will shortly engage in criminal behavior," whereas the *Wesby* standard "requires only that it be reasonable for any particular officer to conclude that there is a substantial chance of criminal activity") (internal citations and quotation marks omitted). Moreover, "an officer's subjective intent doesn't matter for 'ordinary, probable-cause Fourth Amendment analysis." *Id.* at 1244 (quoting *Wren v. United States*, 517 U.S. 806, 813 (1996)).  And "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973).[3]

"Public officials acting within their discretionary authority enjoy qualified immunity from civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action."  *Land v. Sheriff of Jackson County Florida*, --- F.4th ---, 2023 WL 7138510, at *3 (11th Cir.

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Oct. 31, 2023) (internal quotation marks and citation omitted).  "The absence of a constitutional violation ends the analysis of qualified immunity."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

In the context of a false arrest claim, a law enforcement officer who makes an arrest without probable cause is nevertheless entitled to qualified immunity if there was "arguable probable cause" for the arrest.  *Brown*, 608 F.3d at 734 ("To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause.") (citation omitted).  Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants ***could have*** believed that probable cause existed to arrest Plaintiff."  *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (emphasis added).  "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors."  *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001); *see id.* at 1303 n.8 ("Police officers are not expected to be lawyers or prosecutors."). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) (citation and internal quotations omitted).  "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable."  *Brown*, 608 F.3d at 734–35 (citation and

13

internal quotations omitted). When the facts of a case "are not in dispute, whether probable cause existed is a question of law, and summary judgment is appropriate." *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990).

## II.    Whether Officer Davila had probable cause or arguable probable cause to arrest Mr. Jones.

Where an arrestee faces multiple charges, if any one charge is supported by arguable probable cause, the defendant is entitled to qualified immunity with respect to the arrest. *See Skop*, 485 F.3d at 1138 ("If [the officer] possessed probable cause or arguable probable cause to arrest Skop for either [of two possible crimes], he is entitled to qualified immunity."). Because the Court finds that Officer Davila had probable cause or, at the very least, arguable probable cause to arrest Mr. Jones for trespassing, the Court need not reach the issue of whether Officer Davila had probable cause or arguable probable cause to arrest Mr. Jones for the resisting an officer charge.

Section 810.08 of the Florida Statutes provides that a person who was permitted to enter a structure or conveyance but is subsequently "warned by the owner or lessee of the premises, or by a person authorized by the owner or lessee, to depart and refuses to do so, commits the offense of trespass in a structure or conveyance." Fla. Stat. § 810.08(1). "Person authorized," in the context of the statute, means "any owner or lessee, or his or her agent, or any law enforcement officer whose department has received written authorization from the owner or lessee, or his or her agent, to communicate an order to depart the property in the case of a threat to public safety or welfare." Fla. Stat. § 810.08(3).

14

Defendant appears to concede that the charge should have been under section 810.09 of the Florida statutes, titled "[t]respass on property other than structure or conveyance." Fla. Stat. § 810.09; *see* Doc. 43 at 11–12. That section provides that:

> A person who, without being authorized, licensed, or invited, willfully enters upon or remains in any property other than a structure or conveyance:
>
> 1. As to which notice against entering or remaining is given, either by actual communication to the offender or by posting, fencing, or cultivation . . . ; or
>
> 2. If the property is the unenclosed curtilage of a dwelling and the offender enters or remains with the intent to commit an offense thereon, other than the offense of trespass,
>
> commits the offense of trespass on property other than a structure or conveyance.

Fla. Stat. § 810.09(1)(a).

The fact that Officer Davila "wrote down the wrong statute number on the citation is inconsequential as long as probable cause to arrest existed based on the objective circumstances." *United States v. Glover*, Case No. 3:10cr40/MCR, 2010 WL 11526871, at *4 (N.D. Fla. July 27, 2010), *aff'd*, 441 F. App'x 748 (2011); *see also Lee*, 284 F.3d at 1196 ("[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.") (citation and internal quotation marks omitted); *see generally Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason

for his arrest at the time he is taken into custody, we have never held that to be constitutionally required.").

There is no genuine issue of fact as to whether it was reasonable for Officer Davila to believe that Mr. Jones was a person who, without being authorized, willfully remained at the RaceTrac after Officer Davila gave him notice that he had to leave. *See* Fla. Stat. § 810.09. Officer Davila testified that the RaceTrac gas station was designated a "problem" location by the Fort Myers Police Department (Doc. 43-2 at 16–17) and that one of the managers previously told him that she did not want *anyone* on the property charging phones (*Id.* at 27). There had also been trespass authorizations on file with the Fort Myers Police Department since at least 2013, even if one was not on the file at the time of the incident with Mr. Jones. (*See* Doc. 43-3 at 1–4). And Officer Davila's belief that the RaceTrac gas station was a "problem" location was corroborated by Mr. Jones's testimony that he was a regular customer at the RaceTrac, there were a lot of homeless people there, and he "always [saw] [the manager] coming out saying, hey, y'all have to leave." (Doc. 43-5 at 59–60). Moreover, the Video shows Officer Davila telling Mr. Jones, from afar, to "get the f*ck out, get out of here, get out, get off the property." (Video at 00:37–00:44). Mr. Jones did not leave. Given this evidence, no reasonable jury could find that Officer Davila did not have probable cause to arrest Mr. Jones for trespassing because he remained at the RaceTrac after Officer Davila asked him to leave. While the Court finds that Officer Davila had probable cause, the Court also finds that, even if he did not have probable cause, Officer Davila is entitled to qualified

16

immunity because there is no question that he had arguable probable cause to arrest Mr. Jones.[4]  In other words, a reasonable officer in the same circumstance and possessing the same knowledge *could have* believed that there was probable cause to arrest Mr. Jones for trespassing because he remained on the property after being told to leave.

Mr. Jones suggests that there are genuine issues of material fact precluding summary judgment, but he points to no evidence that would create a genuine issue of fact.  For example, in his response to the motion for summary judgment, Mr. Jones claims that he "was a bit of distance away from the Defendant and was shocked, but unsure what profanity the officer yelled at him and why." (Doc. 47 at 3).  But Mr. Jones cited no deposition, affidavit, or anything else in evidence indicating that Officer Davila was too far away for Mr. Jones to hear him, that he did not hear Officer Davila, or that he was "unsure" of what Officer Davila was yelling.  Certainly, he points to no evidence that Officer Davila knew that Mr. Jones could not hear him or even had reason to believe that Mr. Jones did not hear him or see him gesticulating towards him.  (*See* Video at 0:36–0:44).

Mr. Jones also claims that he had permission to be at the RaceTrac.  (Doc. 43-5 at 59).  Assuming that is true, as this Court must when analyzing this summary judgment motion, there is nothing in the video, in Mr. Jones's testimony, or in

---

[4] It appears undisputed that Officer Davila was acting within his discretionary authority when arresting Mr. Jones.  *See, e.g., Lee*, 284 F.3d at 1194 ("In this case, there can be no doubt that [officer] was acting in his discretionary capacity when he arrested [plaintiff].").

Officer Davila's testimony indicating that Officer Davila, at the time of the encounter, was aware that Mr. Jones had sought permission to be there. *Cf. Gates v. Khokhar*, 884 F.3d 1290, 1300 (11th Cir. 2018) (an arresting deputy is not required to "have specific evidence of the subjective intent and knowledge of a subject beyond the subject's conduct that otherwise gives rise to probable cause to arrest"). Indeed, Officer Davila readily admits that he did not ask anyone whether Mr. Jones had permission to charge his phone and instead relied on prior encounters with a RaceTrac manager to determine that Mr. Jones did not have permission to be on the RaceTrac property. (*See* Doc. 43-2 at 27) ("On the day that you . . . saw Mr. Jones, . . . isn't it accurate . . . that you did not speak to the owner or an employee regarding whether they had given specific consent to Mr. Jones that he could be charging the phone there? A. Correct. . . . One of the managers on a previous occasion stated she didn't want anyone on property charging phones.").

To be clear, the Court finds that, because of all of Officer Davila's other reasons to conclude that there was a substantial chance of criminal activity, Officer Davila was not required to affirmatively investigate whether Mr. Jones had permission to be on the property to establish that he had probable cause or arguable probable cause to arrest him. *Cf. Washington*, 25 F.4th at 902 ("[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity.'") (citing *Wesby*, 138 S. Ct. at 61); *Wesby*, 583 U.S. at 57 (probable cause "requires only a probability or substantial chance of criminal

activity, not an actual showing of such activity") (citations and internal quotation marks omitted); *Elliott v. Wilcox*, 641 F. App'x 893, 897 (11th Cir. 2016) (where plaintiff was arrested for trespassing while walking on a trail and officer had received information that there were trespassers in the area, "[w]hatever [plaintiff] knew regarding who owned the land, or what he told [the officer] about his right to be on the trail, is . . . irrelevant because [the officer] believed the power company owned that land and that Elliott was not allowed to walk the trail").

Mr. Jones's other arguments are equally unavailing.  For example, Mr. Jones points to *Palmer v. State*, 112 So. 3d 606 (Fla. 4th DCA 2013), for the proposition that "[a] reasonable suspicion of trespassing must be based upon something more than a mere hunch or guess."  (Doc. 47 at 6).  The Court finds that *Palmer*, is inapposite because the facts are totally different from the facts here.  In *Palmer*, the defendant was standing next to buildings with "no trespassing" signs posted and fled when the officers exited their vehicle, announced their presence, and ordered the defendant to stop.  112 So. 3d at 607.  There, defendant was charged with entering a structure, but there was no evidence that he attempted to enter a building or that either officer believed that he was about to enter a building.  *Id.* at 608.  Here, as already set forth above, although Plaintiff was charged under the incorrect trespassing statute, he was arrested, in part, because Officer Davila asked him to leave the property and he remained on the property.  (*See* Doc. 43-1 at 2) ("Jones Jr was also charged with trespassing as he was 'charging' his cell phone and

not conducting any legitimate business at the Race[]Trac and refused to leave when asked to so by Davila.").

Mr. Jones also argues that he "adequately allege[d] that Defendant[] seized Mr. Jones and that the seizure was unreasonable." (Doc. 47 at 13). But what Mr. Jones alleged in his complaint is largely irrelevant, particularly when compared with the actual evidence presented by Officer Davila because this case is at the summary judgment stage, not at the motion to dismiss stage. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("In response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.") (citing Fed. R. Civ. P. 56(e)).

Officer Davila's policing with respect to Mr. Jones was not ideal. There is no doubt that he could have initially spoken to Mr. Jones in a more respectful tone but, in fairness, Mr. Jones's ensuing comments and responses to Officer Davila were laden with profanity and evasive. And the Video clearly depicts an officer who was responding to a trespass call from a known problem area, where individuals frequent that location and use charging their cell phones as fronts for illegal activity. Furthermore, Officer Davila made diligent efforts to ask Mr. Jones for his name and was met with resistance in some form the entire time, either by not providing his name at first or subsequently by not providing his social security number when the name he provided to Officer Davila did not yield any results in Officer Davila's database search. Although Officer Davila could have asked the

20

employee inside the RaceTrac whether Mr. Jones had permission to charge his phone, or given Mr. Jones another opportunity to explain himself before handcuffing him, that does not change the fact that no reasonable jury could find that Officer Davila did not have probable cause to believe that Mr. Jones was trespassing or, at the very least, that Officer Davila is entitled to qualified immunity because a reasonable officer could have believed that Mr. Jones was trespassing.

### CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly, terminate all deadlines, and close the case.

**ORDERED** at Fort Myers, Florida on November 16, 2023.

_John L. Badalamenti_
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE